UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MISS UNIVERSE, L.P., LLLP,

                      Plaintiff,

      -against-

VIRGELIA B. VILLEGAS and VIRGELIA,
PRODUCTIONS, INC.,

                Defendants.

06 Civ. 4977

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Miss Universe, owner of the pageant and trademark "Miss USA," brought this action against Virgelia Villegas and his production company (collectively, "defendants") for their use of the mark "Miss Asia USA."  Miss Universe alleged trademark infringement under Section 32 of the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051 *et seq.* ("Lanham Act" or "Act"); unfair competition under Section 43(a) of the Act and at common law; and dilution under Section 43(c) of the Act and under New York law.  It requested injunctive relief and compensatory damages.  The defendants moved for summary judgment on all claims, as did the plaintiff on all but the dilution claims.  The parties later withdrew those dispositive motions and stipulated that the evidentiary record was sufficiently developed for the Court to decide the action on the merits.

      This Memorandum Opinion and Order sets forth findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.  For the reasons that follow, the Court grants judgment to the defendants.

**FINDINGS OF FACT**

Miss Universe owns and operates the Miss USA pageant, an annual beauty pageant with a national reputation.  (Defs.' Mem. Ex. B ("Stip.") ¶¶ 1, 5–8.)  The pageant's format is familiar: contestants compete in state pageants, and the winners from each state compete in a national competition.  (Santomauro Aff. ¶ 24.)  The national competitors are winnowed to fifteen, and those fifteen compete in a live telecast for the Miss USA title.  (Calvaruso Aff. Ex. A ("Santomauro Dep.") 12–13.)  This format is not, of course, unique to Miss USA.  (Stip. ¶ 10.)  The Miss America pageant proceeds in roughly the same manner, as do a number of other pageant systems not related to the plaintiff or defendants in this action.  (Santomauro Dep. 16–17.)  The "Miss USA" name is also typical of beauty pageants' names in that it consists of a marital prefix followed by a geographic descriptor.  (Pltf.'s Responses to Defs.' R. 56.1 Stmt. ¶ 6.)  "Miss America" and "Miss World," to name two other well-known pageant operators, do too.

Miss Universe and its predecessors have used the "Miss USA" mark in connection with beauty pageants since at least 1952.  (Stip. ¶ 1.)  Miss Universe has obtained federal and state trademark registrations for "Miss USA," Miss Teen USA," and variations on both.  (Stip. ¶¶ 2–3.)  But Miss Universe does not own and has never used a trademark containing the word "Asia." (Stip. ¶ 9.)

The defendants own and operate Miss Asia USA, a beauty pageant held annually since about 1988.  (Stip. ¶ 11.)  Dindo Reyes, a pageant "aficionado," began using the "Miss Asia USA" mark in connection with beauty pageants in 1988.  (Calvaruso Aff. Ex. B ("Reyes Dep.") 16, 42; Stip. ¶ 11.)  Reyes sold his pageant business in 2003 to defendant Villegas.  (Reyes Dep.

47–50.)  Since 2004, the Villegas defendants have held their own Miss Asia USA pageant. (Calvaruso Aff. Ex. C ("Villegas Dep.") 74.)

In many respects, Miss Asia USA resembles other national beauty pageants, including Miss USA.  It features female contestants who compete in an evening gown and swimsuit competition and a question-and-answer segment; it often employs well-known individuals as judges; and the competition's winner is crowned and sashed and spends her victory year making appearances on behalf of the pageant and various charities.  (Defs. Mem. Ex. E ("Villegas Decl.") ¶¶ 8, 12.)

Still, Miss Asia USA is more than a carbon copy.  The defendants bill Miss Asia USA as a cultural pageant designed to display the rich ethnic traditions and diversity of Asian cultures in the United States.  (Stip. ¶ 12; Villegas Decl. ¶ 8.)  The Miss Asia USA pageant opens each year with a "Parade of National Costumes," and each contestant in the pageant wears a sash with the name of the Asian country she is representing.  (Villegas Decl. ¶ 8–9.)  Only persons with some Asian ancestry may participate in the competition.  (Villegas Decl. ¶ 6.)  The hosts of the competition are of Asian descent, as are many of the judges.  (Villegas Decl. ¶ 10–11.)  Miss USA's pageant does not have this kind of "cultural" or "ethnic" element.  (Santomauro Dep. 13.) Nor does it claim to have any concrete plans to produce or license a cultural pageant like Miss Asia USA.  (Santomauro Dep. 13–15.)  The plaintiff, however, "has explored" that "avenue," and Miss Universe's vice-president of business planning said at deposition that the company is currently discussing whether to refocus the pageant format on an "ethnic or cultural element" rather than an "age element."  (Santomauro Dep. 13–15.)

The level of publicity Miss Asia USA receives is also materially different from that Miss USA receives.  Miss USA and Miss Teen USA events draw considerable media coverage each

year, and the annual pageants are nationally broadcast on prime-time television.  (Stip. ¶ 6–7; Santomauro Aff. ¶ 16, 18.)  The Miss Asia USA pageant has been televised only once, in 2006, on ImaginAsian TV and on Charter Communications, a local cable network in Southern California.  (Villegas Decl. ¶ 14.)

Miss Universe has long opposed the use and registration of marks that it views as infringing its "Miss USA" mark.  (Santomauro Aff. ¶ 21–22.)  These include marks that add a term after "Miss USA," as "Miss USA World" would, and marks that insert a term between "Miss" and "USA," as "Miss Asia USA" does.  (Santomauro Aff. ¶ 22.)  Miss Universe claims that it first became aware of the defendants' use of "Miss Asia USA" in October of 2003, when the defendants sent Miss Universe a letter asking it to sponsor the Miss Asia USA pageant.  (Santomauro Aff. ¶ 6.)  Miss Universe refused, and it objected to the defendants' continued use of the mark.  (Santomauro Aff. ¶ 7.)  Thereafter, defendants continued to use the mark.  They registered the Internet domain name missasiausa.org and now use it as their pageant website.  (Defs.' Answer ¶ 22.)  In 2004, they filed a trademark application with the United States Patent and Trademark Office for the mark "Miss Asia-U.S.A. Pageant."  (Calvaruso Aff. Ex. D.)  Plaintiff opposed this application, and that trademark registration proceeding has been suspended pending a final determination in this action.  (Calvaruso Aff. ¶ 8.)  Defendants have since filed applications for "Miss Teen Asia USA" and "Mrs. Asia USA."  (Calvaruso Aff. ¶¶ 9, 10.)

Miss Universe has presented no survey or polling data as evidence that "Miss Asia USA" could be confused as a pageant affiliated with the owners of "Miss USA."  But in the spring of 2006, Miss Universe did receive six separate emails from four different email addresses inquiring as to whether the "Miss Asia USA" pageant had any relationship to or affiliation with Miss Universe's family of pageants.  (Santomauro Aff. ¶ 5 and Ex. A.)

## CONCLUSIONS OF LAW

I.      **Trademark Infringement Claims**

Section 32 of the Lanham Act makes it illegal to use in commerce, without a trademark-holder's consent, a "reproduction, counterfeit copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1)(a) (2006). To successfully make out a claim under Section 32, the trademark-holder must show that its mark is protectable and that the allegedly infringing mark is likely to confuse consumers. *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004). A valid, incontestable trademark registration is "conclusive evidence" of the plaintiff's exclusive right to use that mark, 15 U.S.C. § 1115(b), and is "presumptively distinctive," *Brown v. Quiniou*, 744 F. Supp. 463, 469 (S.D.N.Y. 1990).

It is common ground between the parties that plaintiff's trademarks for "Miss U.S.A." and "Miss Teen U.S.A." are valid and incontestable. Thus plaintiff has satisfied the first prong of the trademark infringement test. The central question in this case, as in the many other cases where Miss Universe has attempted to quash allegedly infringing marks, is whether the defendants' marks are likely to cause confusion.

This question is not easily parsed in the abstract. *See Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1225 (2d Cir. 1987), *overruled on other grounds by Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 585 (2d Cir. 1993) (calling the likelihood-of-confusion question "a tangle of underbrush"); *see also Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 237 (2d Cir. 1985) ("In assessing the likelihood of confusion, a consideration of the facts and circumstances of each case is necessary."). Recognizing this

reality, Circuits have devised various multi-factored tests to guide a court's assessment of whether a particular trademark is likely to be confused with another. *See, e.g.*, *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) (summarizing the Second Circuit's eight-factor test); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981) (setting forth a similar eight-factor test); *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) (establishing a ten-factor test).

In the Second Circuit, courts follow the test developed in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). Those factors are:

> (i) the strength of plaintiff's mark; (ii) the similarity of the parties' marks; (iii) the proximity of the parties' products in the marketplace; (iv) the likelihood that the plaintiff will bridge the gap between the products; (v) actual confusion; (vi) the defendant's intent in adopting its mark; (vii) the quality of the defendant's product; and (viii) the sophistication of the relevant consumer group.

*Nabisco, Inc.*, 220 F.3d at 46. As the Second Circuit has cautioned, these factors are useful tools, but they should not be mechanically applied, and no one factor is dispositive. *Playtex*, 390 F.3d at 166–67. Put differently, a court should not necessarily find for the party who prevails on the greater number of factors if other, more probative factors point to a different outcome. *Cf. id.* at 167 n.5 (characterizing "the similarity-of-marks factor, the actual-confusion factor, and the bad-faith factor" as "important factors" in the analysis). The Court turns now to consider each of the *Polaroid* factors in turn.

**Strength of the Plaintiff's Mark**

"The distinctiveness of a mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source, determines the mark's strength or weakness." *Gucci America, Inc. v. Action Activewear, Inc.*, 759 F. Supp. 1060, 1063 (S.D.N.Y. 1991) (internal citations and quotations omitted). A mark's relative strength is measured by (1)

"the level of protection of the mark," and (2) "the recognition value of the mark in the marketplace as identifying the source of the goods or services." *Id.*

The first factor implicitly invokes Judge Friendly's famous categorization of trademarks on the spectrum of inherent distinctiveness as (1) generic, (2) descriptive, (3) suggestive, or (4) fanciful or arbitrary. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). The parties dispute whether the "Miss USA" mark is descriptive or instead suggestive, which would afford it a greater degree of protection. A descriptive mark "tells something about a product, its qualities, ingredients, or characteristics." *Estee Lauder Inc. v. The Gap Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997) (quotations omitted). A suggestive mark, by contrast, "suggests the product, though it may take imagination to grasp the nature of the product." *Id.* (quotations omitted). The line between the two is "quite a difficult one to draw." *Real News Project, Inc. v. Independent World Television, Inc.*, No. 06-4322 (GEL), 2008 WL 2229830, at *10 (S.D.N.Y. May 27, 2008) (citation and internal quotation marks omitted).

The Second Circuit has expressly declined to decide whether "Miss USA" is descriptive or suggestive. *See Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 509 (2d Cir. 1969). But in *Miss Teen USA*, a federal district court suggested that, had it needed to decide the issue, it would likely have found the mark descriptive. *Miss Universe, Inc. v. Miss Teen USA, Inc.*, 209 U.S.P.Q. 698, 703 n.2 (N.D. Ga. 1980). This was so, the court said, because the "composite mark is intended to describe its service in the sense that it connotes the idea that the contestants, and especially the eventual winner, represent the best of their kind in the country." *Id.*

Plaintiff's mark is on the border between descriptive and suggestive, but this Court places it on the suggestive side of the line. The "Miss USA" mark certainly says *something* about the product: it at least conveys the idea of a female representing the United States. But it also takes

7

imagination to grasp the nature of the product "Miss USA" offers.  The mark is not descriptive in the same way that, say, "Broadway Deli" and "Broadway Theater" are descriptive of their locations on Broadway.  *See TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 101 (2d Cir. 2001).  Without more, "Miss USA" could easily be mistaken for a superhero or film rather than the victor of a national beauty pageant.  Moreover, "Miss USA" is not a mark that necessarily "deprives competitors of a way to describe their goods."  *See Menashe v. V. Secret Catalogue, Inc.*, 409 F. Supp. 2d 412, 423 (S.D.N.Y. 2006) (finding that "Sexy Little Things" was suggestive, not descriptive, of a lingerie line, in part because "Victoria's Secret's own descriptions of its lingerie in its catalogues and website illustrate that there are numerous ways to describe provocative underwear").  A national beauty pageant could be called something other than Miss USA.  Miss America is the obvious example, but one can imagine others.

As this Court has noted before, suggestiveness alone "does not necessarily determine the strength of a mark."  *Medici Classics Prods. LLC v. Medici Group LLC*, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008) (Holwell, J.).  Courts must also "consider distinctiveness in the marketplace."  *Id.*  Here that question is easily answered.  The defendants acknowledge that the "[m]arks have become known to members of the public due to publicity and advertising associated with the annual Miss USA beauty pageant."  (Defs.' Mem. 14–15.)  And the parties have stipulated that the "Miss USA" mark has acquired secondary meaning.  (Stip. ¶ 8.)  Consequently, the mark is strong.[1]

---

[1] Defendants make much of the Ninth Circuit's statement that the "Miss USA" mark is "weak" because it is just one player in a "crowded field."  (Defs.' Mem. at 15–16 (citing *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988)).)  But the defendants are silent about the Second Circuit's own view that, at least in 1985, the "Miss USA" mark was "strong."  *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 238 (2d Cir. 1985).  "Miss USA" remains distinctive in the marketplace, and thus it remains strong.

**Similarity of the Marks**

In assessing the degree of similarity between two marks, the question is whether, considering the "overall impression" of each mark and the "context in which [the marks] are found," the defendant's mark is likely to be confused with the plaintiff's. *Star Industs., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 386 (2d Cir. 2005); *see Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) ("courts must analyze the mark's overall impression" (internal quotation marks omitted)); *Brennan's, Inc. v. Brennan's Restaurant, L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004) ("juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar").

In analogous cases involving beauty pageant trademarks, courts have reached different conclusions about the similarity between particular marks. *Compare Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134 (9th Cir. 1979) (finding that "Miss Nude USA" and "Mrs. Nude USA" were similar to "Miss USA"), *Miss Universe, Inc. v. Pitts*, 714 F. Supp. 209, 219 (W.D. La. 1989) ("Mrs. USA," "Mrs. Universe," and Mrs. [State or Locality] USA" were each similar to "Miss USA"), *and Miss Universe, Inc. v. Miss Teen U.S.A., Inc.*, 209 U.S.P.Q. 698, 708 (N.D. Ga. 1980) ("Miss Teen USA" was similar to "Miss USA"), *with Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (affirming the district court's finding that "Mrs. of the World" was not similar to "Miss World"), *and Miss Universe, Inc. v. Little Miss U.S.A., Inc.*, 212 U.S.P.Q. 425, 433 (N.D. Ga. 1981) ("Little Miss USA" was not similar to "Miss USA," although the court found infringement for other reasons).

Viewing the plaintiff's and the defendants' marks as a whole, the Court thinks it a close question whether they are similar enough to cause confusion. For guidance it turns to a string of Second Circuit decisions in which likelihood of confusion with the "Miss USA" mark has been

at issue.  In those decisions the Circuit carved out space for other, somewhat similar marks to coexist with "Miss USA."

The decisions arose out of a series of disputes between Miss Universe and one of its former franchisees, Alfred Patricelli.  *See Miss Universe, Inc. v. Patricelli*, 386 F.2d 997 (2d Cir. 1967) ("*Patricelli I*"); *Miss Universe, Inc. v. Patricelli*, 408 F.2d 506 (2d Cir. 1969) ("*Patricelli II*"); *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235 (2d Cir. 1985) ("*Patricelli III*").  The parties' relationship began in the 1950s, when Patricelli organized state beauty contests designed to select contestants for the plaintiff's Miss USA pageant.  *Patricelli II*, 408 F.2d at 507–08.  But in 1959, Patricelli began organizing a national beauty contest for a different international pageant, the World Beauty Pageant in London.  *Id.* at 508.  Although Patricelli claimed to differentiate that contest from Miss USA by calling it "Miss USA-World" and "Miss USA-World Beauty Pageant," the contest came to be advertised and known as "Miss USA."  *Id.*  In 1967, in the lead-up to the first nationally televised broadcast of Patricelli's pageant, Miss Universe obtained a temporary restraining order barring Patricelli from using "'Miss USA,' 'Miss United States,' 'Miss USA-World,' 'Miss USA-World Beauty Pageant,' or any other confusingly similar word or terms."  *Id.*  On appeal, the Second Circuit affirmed the TRO without discussion and remanded the case for trial, but it took care to note that Patricelli could still use "a title descriptive of his contest to select a representative from the United States of America for the World Beauty Pageant in London, England, such as Miss World-USA."  *Patricelli I*, 386 F.2d at 997.  After a trial on the merits, the district court enjoined Patricelli's use of both "Miss USA-World" and "Miss World-USA."  *Patricelli II*, 408 F.2d at 508–09.

The Second Circuit affirmed in part and reversed and remanded in part.  *Id.* at 511.  It agreed with the district court that variations on "Miss USA" that leave that two-word

combination intact—as "Miss USA-World" would—share a "high probability of confusion" because the "Miss USA" portion retains primacy in the mark.  *Id.* at 510.  But it also suggested that a mark that alters "Miss USA" by inserting a "distinguishable major element" in the middle might well be dissimilar enough to avoid infringement.  *Id.* at 510.  As it had in its brief *Patricelli I* decision, the court seemed sensitive to the reality that Miss World was a well-established international pageant and that it needed *some* reasonable way to describe its U.S. pageant.

After *Patricelli II*, Patricelli used his "Miss World-USA" mark for a number of years until Miss World discontinued its relationship with him.  Then he launched a pageant all his own, this time branding it "Miss Venus-USA."[2]  Again Miss Universe sued for trademark infringement, and again Patricelli won.  *See Patricelli III*, 753 F.2d at 236, 238 (finding the two marks "readily distinguishable").  Among its reasons, the court found that inserting "Venus" between "Miss" and "USA" "satisfied our requirement in [*Patricelli II*] that a different distinguishable major element be placed between the primary words allegedly infringed upon."  *Id.* at 238.

The Second Circuit has declined to hold that *all* marks formed by inserting a distinguishable major element between "Miss" and "USA" do not infringe "Miss USA." *Patricelli II*, 408 F.2d at 511.  Still, the *Patricelli* line seems to counsel against readily finding similarity between such marks and the plaintiff's.  The Second Circuit has not defined what a distinguishable major element is, but if "World" and "Venus" qualify, then "Asia" likely does too.

---

[2] Patricelli first called the pageant "Miss Venus World USA," but Miss World sued and obtained an injunction against Patricelli's use of the word "World."  *See Patricelli III*, 753 F.2d at 236–37.  In *Mecca Ltd. v. Patricelli*, No. 78-7427, 1979 U.S. Dist. LEXIS 17592, at *2-*3 (Jan. 15, 1979), the Second Circuit affirmed, "presumably because Patricelli was no longer the Miss World franchisee," *Patricelli III*, 753 F.2d at 237.

To be sure, "Miss Asia USA" is a closer case for similarity than "Miss Venus USA" and possibly than "Miss World USA" as well. "Venus" is a highly distinguishable element of the trademark because it does not obviously describe some aspect or feature of the Miss USA pageant. It does not define a subset of the Miss USA contestants that might be given its own pageant, as "Teen" or even "Nude" might. *Cf. Miss Teen USA, Inc.*, 209 U.S.P.Q. at 708; *Flesher*, 605 F.2d at 1134. Nor does it allude to a clearly analogous pageant, as "Mrs. USA" would. *Cf. Pitts*, 714 F. Supp. at 219. Whatever else "Venus" is,[3] it is not readily confused with the Miss USA pageant system. The same is true of "World" in "Miss World-USA." And it is also true, if to a lesser degree, of "Asia" in "Miss Asia USA." Just as "World" implied the existence of a separate entity unrelated to "Miss USA," "Asia" might imply the existence of an independent pageant unrelated to the plaintiff's family of contests. Of course, perhaps it is also plausible that "Asia" suggests a pageant for Asian Americans sponsored by the owners of Miss USA. But proving that one's claims are plausible is not the same as proving them. And this is especially so considering that the Second Circuit, in contexts involving exactly the mark Miss Universe seeks to protect in this lawsuit, has without exception found dissimilarity between "Miss USA" and another mark with the structure "Miss ___ USA." Although the question is difficult, this Court concludes, following *Patricelli II* and *Patricelli III*, that the similarity factor weighs slightly in favor of the defendants in this case.

**Proximity of the Parties' Services**

This factor "concerns whether and to what extent . . . two products compete with each other." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). It requires a

---

[3] The Oxford English Dictionary's entry yields twelve usages of the word, ranging from the obvious (usage 1a: the "ancient Roman goddess of beauty and love (esp. sensual love)") to the arcane (usage 10: a "genus of bivalve mollusks typically representing the family "Veneridae"). Oxford English Dictionary 523–24 (2d ed. 1991). The Court guesses that the pageant took its name from the goddess, not the mollusk.

court to examine "the nature of the products themselves and the structure of the relevant market," including "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id.*

Miss Universe argues that there is close proximity between the services for which the "Miss USA" and "Miss Asia USA" marks are used, because both are used for beauty pageants. (Pltf.'s Mem. 29–30.)  That argument is true as far as it goes: both pageants select unmarried women from throughout the United States to participate as contestants in their pageants; the pageants use similar segments, including evening gown and swimsuit competitions and question-and-answer sessions (Villegas Decl. ¶¶ 6, 8); contestants in each pageant are judged by individuals with some modicum of fame (Villegas Dep. 88–89); and winners of each pageant receive a crown and sash, then spend a year appearing at functions on the pageant's and various charities' behalves (*id.* 93– 95, 103).

Still, the differences that exist between the two pageants should not be understated.  The Miss Asia USA pageant is quantifiably different from Miss USA and Miss America in that it highlights a particular component of its contestants' identities.  Asian ancestry is a requirement for entry into the competition, and a Parade of National Costumes opens each pageant and underscores the significance of the Asian nations represented in the competition.  (Villegas Decl. ¶ 6, 8–9.)  The evidence also suggests that the target audiences for these two pageants are different.  Miss USA is advertised nationally; it is broadcast nationally; and it generates significant revenue from corporate sponsorships of its pageants.  (Stip. ¶ 6–7; Santomauro Aff. ¶ 16, 18.)  The Miss Asia USA pageant, by contrast, has been broadcast on television only once,

and then on a cable network called ImaginAsian TV[4] and a local cable network in Southern California.  (Villegas Decl. ¶ 14.)  Where services are "sufficiently different in nature," a court "can reasonably infer . . . that the respective target audiences are not identical."  *Real News Project, Inc.*, 2008 WL 2229830, at *17.  This is especially evident here, where the defendants have deliberately marketed Miss Asia USA to Asian-American consumers.  (Villegas Decl. ¶¶ 15, 16.)

These differences are not minor, because they bear on the extent to which the services, albeit similar, actually compete in the marketplace.  *See Brennan's, Inc.*, 360 F.3d at 134 (asking "whether the two products have an overlapping client base that creates a potential for confusion"); *cf. Patricelli III*, 753 F.2d at 238 (finding no proximity between the Miss Venus-USA and the Miss USA pageants because "the competition resembles a sports engagement between a local high school team and a professional team").  To the extent proximity exists between the two pageants, it is "tempered" dramatically by the pageants' different points of emphases, different target audiences, and different forums for consumption.  *See Real News Project, Inc.*, 2008 WL 2229830, at *17.  Thus this factor does not strongly favor Miss Universe. *See Medici Classics Prods. LLC*, 590 F. Supp. 2d at 555 (where products were "distinct, and targeted different audiences," the proximity factor did not strongly favor plaintiff).

**Likelihood that Plaintiff Will Bridge the Gap**

Whether the plaintiff will bridge the gap between the parties' services relates to the "senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996).  In Miss

---

[4] A company employee has described ImaginAsian TV as an "English Asian pop culture channel."  *See* Angela Pang, "Comcast drops ImaginAsian TV," AsianWeek, August 6, 2008, *available at* http://www.asianweek.com/2008/08/06/comcast-drops-imaginasian-tv/ (last visited November 17, 2009).

Universe's case, there is no evidence that the company has real plans to enter the field of beauty pageants for any one ethnic group.  The vice-president of business planning said in a deposition during this litigation that the company has discussed entry into that field, but these vague assertions are hardly enough to demonstrate that Miss USA will likely bridge the gap to create a pageant for women of Asian ancestry.  Thus this factor favors the defendants.

**Actual Confusion**

There is "no more positive or substantial proof of the likelihood of confusion than proof of actual confusion," *Savin Corp. v. Savin Group*, 391 F.3d 439, 459 (2d Cir. 2004) (citation omitted), but "actual confusion need not be shown to prevail," *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  Here, all the plaintiff has proffered are emails from four individuals asking whether the Miss Asia USA pageant was affiliated with the Miss USA pageants.  The Second Circuit has said such "inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion"; instead, they arguably reflect the "lack of confusion between the products" that inspired those inquiries.  *Nora Bevs. v. Perrier Group of Am.*, 269 F.3d 114, 124 (2d Cir. 2001); *see Gruner + Jahr USA Pub. v. Meredith Corp.*, 793 F. Supp. 1222, 1232 (S.D.N.Y. 1992), *aff'd by Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1080 (2d Cir. 1993) (customers' "inquir[ies] as to whether or not a relationship between plaintiff and defendant existed" does not prove "that such persons assumed that plaintiff and defendant were in any manner related").  Plaintiffs typically demonstrate actual confusion through the use of consumer surveys or polls or through evidence of "a diversion of sales, damage to goodwill, or loss of control over reputation." *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir. 1996); *see Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) ("The lack of survey

evidence counts against finding actual confusion.").  Miss Universe has shown none of these things.

**Bad Faith**

The intent factor probes "whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product."  *Cadbury Beverages, Inc.*, 73 F.3d at 482–83.  A showing that the defendant intended to trade on the plaintiff's reputation could be grounds for inferring that defendant intended confusion to result, but "intent is largely irrelevant in determining if consumers likely will be confused as to the source."  *Lois Sportswear*, 799 F.2d at 875.

On the Villegas defendants' intent, the record is mixed.  Villegas was fully aware of the Miss USA pageants when he purchased the rights to the "Miss Asia USA" mark.  (Villegas Dep. 20.)  Villegas has also professed respect for the Miss USA pageant, acknowledging that "there is no question about it" that Miss USA is "the epitome of the beauty pageant industry."  (Villegas Dep. 144.)  Since purchasing the rights to the mark, Villegas has seemed eager to increase the Miss Asia USA pageant's exposure.  He has doubled the Miss Asia USA pageant's attendance; broadcast the pageant on television for the first time; advertised the pageant in national media; and succeeded in soliciting major sponsors like American Apparel.  (Villegas Dep. 52, 61, 75, 110, 113, 118, 121–23.)

Given Villegas's knowledge of the "Miss USA" name prior to purchasing "Miss Asia USA," one might surmise that Villegas has tried to capitalize on Miss USA's renown.  But knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith.  "[A]doption of a trademark with actual knowledge of another's prior registration of a very similar mark may be consistent with good faith."  *W.W.W. Pharm. Co. v. Gillette Co*., 984 F.2d

567, 575 (2d Cir. 1993), *limited on other grounds by Deere & Co. v. MTD Prods., Inc.*, 41 F.3d

39, 46 (2d Cir. 1994) (internal quotations omitted); *see Little Miss USA, Inc.*, 221 U.S.P.Q. at

431 (stating its unwillingness "to infer a wrongful intent from the mere fact that the defendant's

promoters were aware of 'Miss USA' when they adopted 'Little Miss USA'").  This is

particularly true "in the absence of additional evidence indicating an intent to promote confusion

or exploit good will or reputation."  *See Star Industs., Inc.*, 412 F.3d at 388 (citations omitted).

The Court concludes on this record that there is insufficient evidence to find Villegas acted in

bad faith.

**Quality of the Defendant's Product**

The quality factor is concerned with "whether the senior user's reputation could be

jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Star

Industs.*, 412 F.3d at 389.  The parties do not dispute that the defendants' product is "high-

quality" and "well-respected."  (Pltf.'s Mem. 36; Defs.' Reply 10.)  Because the plaintiff is

"entitled to the protection of his mark from all infringing users," not just users with products of

inferior quality, *see McDonald's Corp. v. McBagel's, Inc.*, 649 F. Supp. 1268, 1279 (S.D.N.Y.

1986), this factor is neutral in the analysis.

**Sophistication of the Relevant Consumer Group**

Generally, "the more sophisticated the purchaser, the less likely he or she will be

confused by the presence of similar marks in the marketplace."  *Savin Corp.*, 391 F.3d at 461.

The key question is whether "numerous ordinary prudent purchasers would likely be misled or

confused as to the source of the product in question because of the entrance in the marketplace"

of the new mark.  *Id.*  The purchasing public of beauty pageants like those the parties operate

may be articulated as "all those individuals likely to attend a contest as a spectator or to watch a telecast, and all those who might be inclined or persuaded to place an advertisement with either of the two parties." *Miss Teen USA, Inc.*, 209 U.S.P.Q. at 706 n.5.

Parties may prove sophistication "by direct evidence such as expert opinions or surveys" or, in some cases, by "the nature of the product or its price." *Star Industs.*, 412 F.3d at 390. Here neither party has presented any direct evidence on the question of consumer sophistication. Absent such evidence, the Court has little reason to believe that spectators or television viewers of beauty pageants are particularly sophisticated about those viewing decisions. Consumers who watch beauty pageants on television have less reason to educate themselves about the source of Miss Asia USA than consumers do when, for example, selecting between two vodkas with very different price tags. *See id.*, 412 F.3d at 390; *see also Narwood Prods., Inc. v. Lexington Broadcast Services Co., Inc.*, 541 F. Supp. 1243, 1251 (S.D.N.Y. 1982) (average television viewers, "because they have no financial stake in choosing a program, . . . would probably devote as little attention to ascertaining the producer of a program as the 'average purchaser of a ball of twine'").

Potential advertisers for beauty pageants, by contrast, are a much more sophisticated group of consumers. *See Motown Prods., Inc. v. Cacomm, Inc.*, 668 F. Supp. 285, 291 (S.D.N.Y. 1987), *rev'd on other grounds by Motown Prods., Inc. v. Cacomm, Inc.*, 849 F.2d 781, 787 (2d Cir. 1988) (noting in passing the "sophistication of television programming executives and advertisers"); *cf. Narwood Prods., Inc. v. Lexington Broadcast Services Co., Inc.*, 541 F. Supp. 1243, 1251 (S.D.N.Y. 1982) (purchasers of "television and radio programming" are "highly sophisticated"). But because the Court must consider the probability of confusion on the part of

"both discriminating and relatively unknowledgeable buyers," *see id.* (internal quotations omitted), it finds that this factor tilts in the plaintiff's favor.

**Balancing the Factors**

Balancing the factors, two weigh in favor of Miss Universe—the strength of its mark and the relative unsophistication of certain members of the consuming public—and a third, the proximity of the parties' services, favors Miss Universe only slightly, if at all.  Four factors favor the defendants: the dissimilarity of the marks; the fact that Miss Universe will not likely bridge the gap; the total absence of evidence of actual confusion between the parties' services; and the lack of bad faith.  One factor, the quality of the defendants' product, is neutral.

More *Polaroid* factors support the defendants, but this, standing alone, is not reason enough to find against Miss Universe.  As the Court has noted, the issue is not susceptible to a mechanical solution.  Even balancing the three factors the Second Circuit has called "perhaps the most significant," *see Mobile Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)—the strength-of-mark, similarity-of-marks, and proximity-of-services factors—does not yield a ready answer.  The first of those factors favors the plaintiff, the second slightly favors the defendants, and the third favors neither party very strongly.

The merits of the parties' contentions are close to equipoise.  But as courts regularly charge the jury, when the scales are evenly balanced, the party with the burden of proof loses. *See* Leonard B. Sand, et al., *Modern Federal Jury Instructions* ¶ 73.01 (2007); *United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses.").

Given the record before it, the Court concludes that Miss Universe has not proven its case here for trademark infringement by a preponderance of the evidence.  The Court does not say that all variations on "Miss USA" with a major distinguishable element are non-infringing.  *See Patricelli II*, 408 F.2d at 511 (declining to so hold).  Indeed, had the plaintiff submitted proof of actual confusion, it might well have won the day.  In the absence of such or other compelling evidence of likelihood of confusion, however, the defendants are entitled to judgment on the plaintiff's trademark infringement claim.

## II.       Dilution Claims

Even a junior mark not easily confused with a famous mark might violate trademark law by *diluting* the famous mark.  Dilution is the loss of a trademark's ability to clearly identify one source.  *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (internal citations and quotation marks omitted); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 268 (4th Cir. 2007).  As examples of marks that risk diluting a famous mark, the federal dilution statute's legislative history gives "DuPont shoes," "Buick aspirin," and "Kodak pianos."  H.R. Rep. No. 104-374, at 3 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 1029, 1030.

Although Miss Universe has not developed its theory of dilution in detail, its argument seems to be that the use of "Miss Asia USA" risks making "Miss USA" less distinctively a mark of Miss Universe, in the same way that "Buick aspirin," over time, might make "Buick" less distinctively a mark of the automobile company.  Advancing this theory, Miss Universe brings dilution claims under both federal and state law.

A.      **Federal Trademark Dilution**

Dilution under Section 43(c) of the Lanham Act, as amended by the Federal Trademark

Dilution Act of 1995, Pub. L. No. 104-98, 109 Stat. 985 (the "FTDA") and, more recently, the

Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730 (the "TDRA"),

requires proof that: "(1) the mark is famous, (2) the defendant is making use of the mark in

commerce, (3) the defendant's use of the mark began after the mark became famous, and (4) the

likelihood of dilution."[5]  *Heller Inc. v. Design Within Reach, Inc.*, No. 09-1909 (JGK), 2009 WL

2486054, at *3 (S.D.N.Y. Aug. 14, 2009) (citing 15 U.S.C. § 1125(c)(1)).  The parties agree that

"Miss USA" is a famous mark that the plaintiffs now use in commerce and did use in commerce

prior to the defendants' use of "Miss Asia USA."  The only element in dispute, then, is whether

dilution is likely.[6]

A plaintiff can make out a claim of dilution either by showing dilution by blurring or by

showing dilution by tarnishment.  *See* 15 U.S.C. § 1125(c).  Here, although Miss Universe seems

to be claiming dilution by blurring, it does not actually specify which type of dilution it alleges.

Thus a few words about tarnishment are in order before turning to blurring, the central dilution

theory of the case.

---

[5] The defendants claim that the Court should apply a previous version of the federal dilution statute that required a showing of *actual* dilution, because its rights to the trademark vested prior to either the FTDA's or the TDRA's passage.  The Court disagrees.  After this action was commenced, Congress amended the FTDA to, among other things, replace the "actual dilution" requirement with a "likely dilution" one.  Pub. L. No. 109-312, 120 Stat. 1730. The Second Circuit has clearly held that an injunction issued for an FTDA violation presents "no retroactivity problem" because it "provide[s] only prospective relief."  *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 502 (2d Cir. 2000).  Moreover, the Second Circuit has applied the TDRA retroactively to a case commenced in 2005.  *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 477 F.3d 765, 766 (2d Cir. 2007). Accordingly, the Court applies the new federal standard and asks whether the plaintiff has proven a likelihood of dilution.

[6] To imply that the parties have carried on sustained argument about the plaintiff's trademark dilution claims would overstate things.  Miss Universe moved for summary judgment on all its claims *except* dilution, and its papers barely touch on dilution, much less argue it in any detail.  The defendants did move for summary judgment on the plaintiff's dilution claims, but their arguments are nearly as sparse as Miss Universe's.

1.      **Dilution by Tarnishment**

Dilution by tarnishment is an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).  Tarnishing may occur when a mark is "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  *Hormel Foods Corp.*, 73 F.3d at 507 (internal quotation marks omitted).

Here, Miss Universe has presented absolutely no evidence that "Miss Asia USA" has tarnished its own mark.  Indeed, it presents a very different picture in its briefs, applauding the defendants for running a "high-quality" and "well-respected" pageant.  (Pltf.'s Mem. 36.)  Given the plaintiff's admissions, there can be no serious question that "Miss Asia USA" is not tarnishing the plaintiff's mark.  The plaintiff's real concern is blurring, which the Court discusses below.

2.      **Dilution by Blurring**

The Lanham Act defines dilution by blurring as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Section 43(c), as amended in 2006, gives a nonexhaustive list of six factors courts may consider in assessing dilution by blurring:

(i)      The degree of similarity between the mark or trade name and the famous mark.
(ii)     The degree of inherent or acquired distinctiveness of the famous mark.
(iii)    The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
(iv)     The degree of recognition of the famous mark.
(v)      Whether the user of the mark or trade name intended to create an association with the famous mark.
(vi)     Any actual association between the mark or trade name and the famous mark.

*Id.* § 1125(c)(2)(B).

**Similarity**

The Second Circuit recently ruled that its prior standard, which made "substantial similarity" a threshold requirement for dilution claims, did not survive Congress's 2006 amendments to Section 43(c). *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, No. 08-3331, 2009 WL 4349537, at *6 (2d Cir. Dec. 3, 2009). A district court must now weigh the *degree* of similarity—substantial or not—between particular marks as just one of the factors that bear on the dilution question. Substantial similarity is not necessarily required, and a lack of similarity is not necessarily dispositive. *See Louis Vuitton Malletier*, 507 F.3d at 266 ("[n]ot every factor will be relevant in every case"). Still, a finding that two marks lack similarity is probative.

In *Starbucks*, the Second Circuit affirmed the district court's finding that "Charbucks" and "Starbucks" were only "minimally similar." *Starbucks*, 2009 WL 4349537, at *4. As support, the court noted that the word "Charbucks" was accompanied by a "Mister" prefix or "Blend" suffix—combinations that "lessened the similarity" between the two marks. *Id.* at *4- *5. Here, "Miss USA" bears some obvious resemblance to "Miss Asia USA," in that the two marks share two words, with only an "Asia" distinguishing them. But, as with "Mister" or "Blend" in *Starbucks*, the distinguishing feature is also evident: "Asia" is a noticeably different element of the defendants' mark.

As this Court has already said, the defendants' and Miss Universe's marks are somewhat similar, but not quite enough so to create a likelihood of confusion. So too here, where a degree of similarity exists, but not enough for the factor to point decisively in Miss Universe's direction.

**Distinctiveness**

The dilution statute directs courts to consider the extent of a famous mark's distinctiveness.  Distinctiveness "refers to inherent qualities of a mark," which makes it "quite different from fame."  *Sporty's Farm LLC v. Sportsman's Market, Inc.*, 202 F.3d 489, 497 (2d Cir. 2000).  Indeed, famous marks may lack distinctiveness, and obscure marks may be awash in it.  *Id.*  "Miss USA," as this Court has already found, is an inherently distinctive mark.  It is entitled to that presumption by virtue of the incontestability of its trademark registration.  *See Savin Corp. v. Savin Group*, 391 F.3d 439, 451 (2d Cir. 2004).  Moreover, the mark is distinctive because, on Judge Friendly's spectrum of distinctiveness, it is suggestive rather than descriptive.

That entitles "Miss USA" to some protection under federal dilution law, but the protection is not limitless.  Because distinctiveness "is the quality that the statute endeavors to protect, the more distinctiveness [a] mark possesses, the greater the interest to be protected." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 217 (2d Cir. 1999), *abrogated on other grounds*, *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003).  Correspondingly, a less distinctive mark receives less protection under dilution law.  *Id.*  In *Nabisco*, for example, the Second Circuit found that the goldfish shape of Pepperidge Farm's Goldfish crackers was only "moderate[ly]" or "reasonably" distinctive.  *Id.*  It was not purely descriptive, because a fish shape does not describe any particular quality of a cheese cracker.  *Id.*  But neither was it purely made-up, like the word "Kodak" is: children's cookies and crackers are often cut in animal shapes, and companies "often use an animal's likeness as a trademark."  *Id.*  Thus the court concluded that the mark's distinctiveness was only moderate and, taken alone, might even suggest no likelihood of dilution.  *See id.* at 220.

"Miss USA," while a suggestive mark, is much less fanciful or made-up than a goldfish shape for crackers.  It verges on descriptive, and has even been found descriptive by other courts. *See Miss Universe, Inc. v. Miss Teen USA, Inc.*, 209 U.S.P.Q. 698, 703 n.2 (N.D. Ga. 1980).  It is fair to say that the limited distinctiveness of "Miss USA" lessens the degree of protection dilution law affords it.

### Substantially Exclusive Use

The defendants do not question that Miss Universe maintains substantially exclusive use of the "Miss USA" mark.  The plaintiff opposes registration and use of marks that it perceives to infringe its own, and it has succeeded in obtaining injunctions against the use of marks like "Miss Nude USA" and "Mrs. Nude USA," *see Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1134 (9th Cir. 1979), and "Mrs. USA," "Mrs. Universe," and Mrs. [State or Locality] USA," *see Miss Universe, Inc. v. Pitts*, 714 F. Supp. 209, 219 (W.D. La. 1989).  It claims to spend more than three hundred thousand dollars each year to enforce its trademarks.  (Santomauro Aff. ¶ 21.) "Miss USA," in short, is not a trademark whose value is already substantially diluted by its owner's carelessness or indifference in protecting it.  Miss Universe takes care to guard both the mark's value and its exclusive use of that mark.

### Recognition

The defendants readily acknowledge the fame and recognition value of the "Miss USA" mark.  (Villegas Dep. 144.)  The plaintiff has used that mark for decades in connection with its beauty pageants.  (Stip. ¶ 6.)  The Miss USA and Miss Teen USA pageants are nationally televised each year and reach millions of households.  (Stip. ¶ 7.)  Media coverage is substantial,

and Miss Universe's various internet websites receive over a billion hits annually.  (Santomauro

Aff. ¶ 32.)  The mark's recognition value speaks for itself.

### Intent

The intent factor does not ask whether a defendant acted in bad faith; instead, it examines

purely a defendant's "intent to associate" its own mark with the plaintiff's.  *Starbucks*, 2009 WL

4349537, at *7.  Still, the Court's earlier analysis of bad faith in the infringement context is

relevant here.  Miss Universe has produced no evidence to show that the defendants intended to

capitalize on the renown of the "Miss USA" mark—or even *associate* with that mark—in

fashioning their own.  The plaintiff has given the Court no reason to disbelieve the defendants'

contention: that their mark was originally crafted "for reasons that had nothing to do with the

Miss USA marks" and everything to do with devising a title to describe a pageant for American

women of Asian ancestry.  (Defs.' Mem. 21.)  On that count, "Miss Asia USA" fits the bill.

### Actual Association

As does actual confusion in the infringement analysis, the actual association factor invites

courts to weigh data—on-the-ground evidence of association between marks.  And, just as Miss

Universe offered no evidence of actual confusion between its mark and the defendants', it has

offered no evidence of actual association between the two.  All it has are several emails asking

whether Miss Universe and the Miss Asia USA pageant are in any way affiliated.  These isolated

inquiries fall far short of evidence that consumers will associate the defendants' mark with the

plaintiff's.  By contrast, the plaintiff in *Starbucks* submitted telephone survey results that showed

"30.5% of consumers responded 'Starbucks' to the question: [w]hat is the first thing that comes

to mind when you hear the name 'Charbucks.'"  *Starbucks*, 2009 WL 4349537, at *7.  Miss

Universe offers no survey results or poll numbers here, and thus fails to show any instances of actual association between the two trademarks.

### Applying the Factors

Applying the dilution factors to this case, the Court concludes that Miss Universe has failed to show by a preponderance of the evidence that "Miss Asia USA" is likely to blur the distinctive source of "Miss USA."  To be sure, "Miss USA" is a famous mark of some renown, and Miss Universe's use of it has been substantially exclusive for some time.  Moreover, the mark is moderately distinctive.  But these findings are not enough to overcome the plaintiff's failures of proof here. The plaintiff's mark is not *highly* distinctive and so does not receive the Lanham Act's utmost protection from dilution.  Nor are the marks sufficiently similar to warrant the inference that association is likely.  There is also no evidence of actual association between the two marks, and Miss Universe has not shown that the defendants' mark was intended to foster associations with "Miss USA."

These last two findings are important reminders of the absence of evidence marshaled by Miss Universe.  In a recent trademark dilution case, the Supreme Court cautioned that "[w]hatever difficulties of proof may be entailed, they are not an acceptable reason for dispensing with proof of an essential element of a statutory violation."  *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 434 (2003).  Evidence, in the form of surveys or polls, is commonly collected in cases like this one.  But Miss Universe has offered the Court nothing in support of its claim that the defendants are likely to dilute its mark.  Given the conspicuous absence of evidence on this record, the defendants are entitled to judgment on Miss Universe's federal dilution claim.

### B.      State Trademark Dilution

The New York dilution statute provides that a "[l]ikelihood . . . of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief . . . notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."  N.Y. Gen. Bus. Law § 360-l.  Section 360-l has been held to protect against both dilution by blurring and dilution by tarnishment.  *See Hormel Foods Corp.*, 73 F.3d at 506–07.  Unlike federal trademark dilution law, the New York law requires only that the plaintiff's mark be "truly distinctive," not that it be famous.  *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004); *see Starbucks*, 2009 WL 4349537, at *11.  Moreover, the factors used to assess dilution by blurring under New York law are not "coextensive."  *Starbucks*, 2009 WL 4349537, at *11.

Courts look to six factors, including "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."  *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F. 3d 550, 558 (2d Cir. 2002).  One key difference is that "New York law does not permit a dilution claim unless the marks are 'substantially' similar."  *Starbucks*, 2009 WL 4349537, at *11.  The substantial similarity test requires more than the "familiar test of similarity" used in the traditional infringement context. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:117 (2004). Marks "must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same."  *Id.*; *see Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 167 (2d Cir. 2004) (marks must be "very" or "substantially" similar).  Because "Miss Asia USA" is not similar enough to "Miss USA" to infringe it, it

follows that the former is not similar enough to dilute the latter.  Thus defendants are entitled to judgment on Miss Universe's state dilution claim.

### III.      Unfair Competition Claims

Finally, the plaintiff brings a Lanham Act claim for false designation and an unfair competition claim at state common law.  To prove false designation under Section 43(a), as to prove infringement under Section 32, a plaintiff must show a likelihood of confusion.  *See Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) ("same analysis" applies to Section 32 and Section 43(a) claims); *Le Book Pub., Inc. v. Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 312 (S.D.N.Y. 2005) (Lynch, J.).  Similarly, to prove unfair competition at New York common law, a plaintiff seeking equitable relief must show (1) a likelihood of confusion and (2) bad faith.  *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995).  For the same reasons the Court concludes that Miss Universe has not demonstrated a likelihood of confusion under Section 32 of the Act, it concludes the plaintiff has not done so as required to prove its unfair competition claims.  The defendants are entitled to judgment on these claims.

## CONCLUSION

For the reasons given, the plaintiff has failed to prove any of its claims by a

preponderance of the evidence. The Clerk of the Court is directed to enter judgment for the

defendants and close this case.

SO ORDERED.

Dated: New York, New York
    December **9**__, 2009

                               Richard J. Holwell
                            United States District Judge